*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A25-1685**

Advanced Correctional Healthcare, Inc., et al.,
Appellants,

Minnesota Sheriff's Association, et al,
Appellants,

Becker County, et al.,
Appellants,

St. Louis County,
Appellant,

Steele County,
Appellant,

vs.

Paul Schnell,
Respondent.

**Filed June 15, 2026
Affirmed
Bratvold, Judge**

Ramsey County District Court
File No. 62-CV-25-5225

Sarah M. Hoffman, Bassford Remele, P.A., Minneapolis, Minnesota; and

Peter R. Jennetten (pro hac vice), Quinn Johnston, Peoria, Illinois (for appellants Advanced Correctional Healthcare, Inc., et al.)

Richard D. Hodsdon, Stillwater, Minnesota (for appellants Minnesota Sheriffs' Association, et al.)

Brian W. McDonald, Becker County Attorney, Detroit Lakes, Minnesota (for appellants Becker County, et al.)

Kimberly J. Maki, St. Louis County Attorney, Nick D. Campanario, Assistant County Attorney, Duluth, Minnesota (for appellant St. Louis County)

Robert J. Jarrett, Steele County Attorney, Owatonna, Minnesota (for appellant Steele County)

Keith Ellison, Attorney General, Kevin M. Jonassen, Christy L. Hall, Assistant Attorneys General, St. Paul, Minnesota (for respondent)

Considered and decided by Bratvold, Presiding Judge; Ross, Judge; and Reilly, Judge.[*]

## NONPRECEDENTIAL OPINION

**BRATVOLD**, Judge

Appellants are individuals, corporations, and government entities responsible for providing medical care to incarcerated persons in correctional facilities. Appellants sued to challenge the constitutionality of recently enacted Minnesota Statutes section 241.021, subdivision 4f (Supp. 2025), which governs the licensing and supervision of correctional facilities under the authority of the Minnesota Department of Corrections (DOC). Subdivision 4f(a) requires licensed correctional facilities to administer "the same medications" prescribed to incarcerated persons before their incarceration. Appellants received a temporary restraining order (TRO) by stipulation among the parties and moved for a temporary injunction to block enforcement of the statute during the lawsuit. The

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

district court denied the temporary injunction and dissolved the TRO, and this interlocutory appeal follows. We affirm.

**FACTS**

In May 2025, the legislature amended Minnesota Statutes section 241.021 and adopted subdivision 4f: "Correctional facilities licensed by the commissioner shall administer to confined and incarcerated persons the same medications prescribed to those individuals prior to their confinement or incarceration." Minn. Stat. § 241.021, subd. 4f(a); *see also* 2025 Minn. Laws ch. 35, art. 5, § 6, at 694. Subdivision 4f(b) has three exceptions,[1] providing that subdivision 4f does *not* apply when

> (1) a licensed health care professional determines, after consulting with the licensed health care professional who prescribed the medication, that the prescribed medication is not medically appropriate for the person based on the person's medical condition or status;
> (2) a licensed health care professional determines a medication that is at least as effective as the current medication the person is prescribed is available to treat the condition and the licensed health care professional who prescribed the current medication approves the change in medications; or
> (3) the person provides written notice to the licensed health care professional who is responsible for inmate health

---

[1] Subdivision 4f(b) includes prefatory language stating that these exceptions do not apply to "a confined or incarcerated person who is subject to a Jarvis order that dictates otherwise." A *Jarvis* order authorizes the involuntary administration of neuroleptic medication. *See Jarvis v. Levine*, 418 N.W.2d 139, 150 (Minn. 1988). Neuroleptic medication is used for "sedation of the nervous system"; the term may be used interchangeably with "antipsychotic" medication. *Id.* at 140 n.1.

> care at the correctional facility that the person no longer desires
> to take the medication.

Minn. Stat. § 241.021, subd. 4f(b).[2] Because subdivision 4f and its exceptions were adopted as part of an appropriations bill, they became effective on July 1, 2025.[3]

Before subdivision 4f took effect, appellants filed a complaint seeking a permanent injunction to block respondent Paul Schnell, in his official capacity as Minnesota Commissioner of Corrections, from enforcing subdivision 4f and further requesting declaratory-judgment relief as described below. Appellants are: three corporations that provide medical services or medical staffing to Minnesota county jails; four individual medical providers who are employed by one of the appellant corporations, including two physicians and two certified nurse practitioners; thirteen Minnesota counties; five county sheriffs; and the Minnesota Sheriffs' Association (MSA).

The amended complaint alleges three claims for declaratory-judgment relief under the Minnesota Uniform Declaratory Judgments Act, Minnesota Statutes sections 555.01-.16 (2024). Each claim incorporates the allegation that subdivision 4f

---

[2] The legislature recently enacted revisions to subdivision 4f effective August 1, 2026. 2026 Minn. Laws, ch. 97, art. 4, § 1; Minn. Stat. § 645.02 (2024) ("Each act, except one making appropriations, enacted finally at any session of the legislature takes effect on August 1 next following its final enactment, unless a different date is specified in the act."). The 2026 amendment is not before us in this appeal, and we consider only the 2025 version of subdivision 4f.

[3] "An appropriation act or an act having appropriation items enacted finally at any session of the legislature takes effect at the beginning of the first day of July next following its final enactment, unless a different date is specified in the act." Minn. Stat. § 645.02; *see* 2025 Minn. Laws, ch. 35, arts. 1-2 (setting appropriations for the judiciary and public safety), 5, § 7, at 694 (adding subdivision 4f to section 241.021).

"mandates the administration of medication that could be harmful or fatal to inmates who are in the custody" of correctional facilities that are subject to the statute.

Count 1 alleges that subdivision 4f compels appellants to provide medical care that may violate inmates' rights under the Eighth and Fourteenth Amendments to the U.S. Constitution and article I, section 5 of the Minnesota Constitution and that subdivision 4f prevents appellants "from complying with their obligations to provide care that complies" with these constitutional rights. Count 2 alleges that subdivision 4f violates the liberty and property rights of the corporate and individual medical-provider appellants under the Fourteenth Amendment by compelling them to violate their professional obligations in order to comply with state and federal law. Count 3 alleges that subdivision 4f would compel the individual medical-provider appellants to violate professional standards in the Minnesota Medical Practice Act and the Minnesota Nurse Practice Act. For each count, appellants seek a declaratory judgment that subdivision 4f is unconstitutional or unlawful and a permanent injunction against its enforcement.

Appellants moved for a temporary injunction to block enforcement of subdivision 4f during the lawsuit. Four days later, the parties stipulated to entry of a TRO to enjoin enforcement of subdivision 4f until August 1, 2025. The district court filed a TRO "in effect until August 1, 2025, unless extended or rescinded by Order of the Court." The district court later extended the TRO until it ruled on appellants' motion for temporary injunctive relief. Respondent opposed the motion for a temporary injunction.

In support of their motion for a temporary injunction, appellants submitted over 20 affidavits about the risk of harm posed by subdivision 4f, including affidavits of medical

doctors, nurse practitioners, jail administrators, and sheriffs. One medical doctor averred that they had "encountered situations where the administration of outside prescriptions tendered or reported by the patient in custody would have harmed or possibly killed the patient." The medical doctor's affidavit gave examples, explaining the potential harm from (1) Ativan or Suboxone administered while a patient is "under the influence of other drugs"; (2) side effects from "medications like Seroquel, SSRIs, and gabapentin" if a patient has not been taking the prescribed dose regularly and immediately resumes "maintenance doses"; (3) risk of severe bleeding "if a patient is on a blood thinner medication like Coumadin, and is also abusing alcohol"; and (4) continuing combinations of medications that can "alter heart rhythms" and "put patients at risk of dangerous and potentially fatal heart rhythm abnormalities."[4]

The medical doctor also attested that the "correctional environment poses unique challenges generally and regarding medications in particular. Medications can be diverted and misused in ways that are rare or absent outside the jail." The medical doctor averred that reliance "upon primary care providers, who are generally unfamiliar with the correctional environment, will lead to subpar care and cause patients to suffer unnecessary morbidity and even mortality." The medical doctor also attested that they would be unable to "comply with both the mandate of new Subdivision 4f and [their] professional responsibilities" because subdivision 4f would require that the medical doctor "administer

---

[4] In another affidavit, a certified nurse practitioner discussed the possible need to adjust diabetes medication "quickly, in order to avoid severe hypoglycemia" because of dietary changes during confinement.

6

or direct the administration of medication that [they] know would be harmful or potentially fatal to [their] patients in the jail."

The medical doctor recognized that two of subdivision 4f's exceptions require approval from a prescribing provider to change an existing medication. *See* Minn. Stat. § 241.021, subd. 4f(b)(1)-(2). The medical doctor averred that "[c]ommunity providers are generally not available" to discuss changes to an inmate's prescription and are "likely not willing to accept the responsibility and the risk of liability associated with making decisions regarding the administration of medications in the jail." As for subdivision 4f's exception requiring a patient's written consent, *id.*, subd. 4f(b)(3), the medical doctor attested that "[m]any inmates are poor historians," experience "mental health or substance abuse issues that significantly impair their cognitive and communication abilities," or "may not agree with changes to their medications due to suspicion regarding the jail medical provider, animosity toward jail staff, drug or alcohol intoxication, mental health crises, or a desire to deliberately cause self-harm."

The affidavits of other individual medical providers were submitted in support of appellants' motion and expressed similar concerns. One averred that it is "very important that correctional healthcare providers be able to exercise their independent, professional judgment about medications that should be given to detainees." Another attested, "I have personally handled situations in which continuing all of an inmate's [prescribed] medications would have been inappropriate and dangerous to the patient." A nurse attested to an incident when an "inmate came into the jail with a prescription of a high dose of Lamictal" despite not having taken that medication for at least one month. The nurse

7

averred that "[i]f this medication had been given at the prescribed dosage as the new law would require . . . it could have had serious consequences," for example, causing "a serious skin condition that can be life-threatening."

The affidavits of sheriffs and jail administrators state, among other things, that (1) affiants "have never overruled a prescription for medication issued by a provider based on the cost of medication" and (2) "it is often very difficult to verify with community providers in a timely manner the accuracy of the information provided by the inmates" about their prescriptions.

Finally, appellants filed an affidavit from the attorney representing the MSA. The attorney attested to and identified specific DOC enforcement actions against county correctional facilities in 2023 and 2024. The attorney averred that "DOC has demonstrated a marked propensity to take adverse action against county jails when it perceives that rules or statutes within its authority to enforce have been violated." The attorney also attested that, during a meeting in June 2025, DOC representatives stated that "they would be developing protocols to determine compliance with" subdivision 4f and that "licensed facilities that did not comply with the terms of the statute could be subject to sanctions and consequences." The attorney's affidavit also summarized discussions among DOC staff, obtained through a data-practices request, expressing concern about the legality of subdivision 4f and whether enforcement posed administrative issues.

The district court heard oral argument on appellants' motion for a temporary injunction. On September 8, 2025, the district court denied appellants' motion for a temporary injunction and dissolved the TRO in an order that included a 13-page

8

memorandum (September order). Appellants moved the district court to stay enforcement of the September order pending appeal and to reinstate the TRO; the district court denied appellants' motion in January 2026. On appellants' motion, this court reviewed the district court's order denying a stay and determined that the district court did not abuse its discretion.[5]

This appeal follows.

## DECISION

"A temporary injunction is an extraordinary equitable remedy." *Miller v. Foley*, 317 N.W.2d 710, 712 (Minn. 1982). "Its purpose is to preserve the status quo until adjudication of the case on its merits." *Id.* A temporary injunction should be granted "only when it is clear that the rights of a party will be irreparably injured before a trial on the merits is held." *Id.*

The district court has discretion to grant or deny a temporary injunction, and appellate courts will reverse only for "clear abuse of that discretion." *Carl Bolander & Sons Co. v. City of Minneapolis*, 502 N.W.2d 203, 209 (Minn. 1993). "An appeal from an order denying a motion for a temporary injunction is strictly limited in scope" because the district court's ruling "is largely an exercise of judicial discretion." *Hvamstad v. City of*

---

[5] In support of their initial motion for a stay pending appeal, appellants submitted additional evidence that was not before the district court when it denied appellants' motion for a temporary injunction. On appeal, we limit our consideration to the appellate record and the materials submitted to the district court at the time it made the decision under review. Minn. R. Civ. App. P. 110.01 (stating that the appellate record consists of documents and exhibits "filed in the trial court"); *Loth v. Loth*, 35 N.W.2d 542, 550 (Minn. 1949) (stating that appellate courts generally limit their consideration to the record in front of the district court at the time of its decision).

*Rochester*, 276 N.W.2d 632, 632 (Minn. 1979). Appellate courts "view the facts alleged in the pleadings and affidavits as favorably as possible to the party who prevailed below." *Id.* at 633.

In *Dahlberg Brothers, Inc. v. Ford Motor Co.*, the supreme court articulated five factors for district courts to apply when considering a motion for a temporary injunction. 137 N.W.2d 314, 321-22 (Minn. 1965). The *Dahlberg* factors are as follows:

> (1) The nature and background of the relationship between the parties preexisting the dispute giving rise to the request for relief.

> (2) The harm to be suffered by plaintiff if the temporary restraint is denied as compared to that inflicted on defendant if the injunction issues pending trial.

> (3) The likelihood that one party or the other will prevail on the merits when the fact situation is viewed in light of established precedents fixing the limits of equitable relief.

> (4) The aspects of the fact situation, if any, which permit or require consideration of public policy expressed in the statutes, State and Federal.

> (5) The administrative burdens involved in judicial supervision and enforcement of the temporary decree.

*Id.* (footnotes omitted).

Here, the district court determined that, based on the record before it, factor (1) was neutral, factors (2)-(4) weighed against granting a temporary injunction, and factor (5) favored granting an injunction. Appellants challenge the district court's determinations on factors (1)-(4). Because the parties' arguments focus on factor (3), appellants' likelihood of success on the merits, we address that factor first. We then consider, in turn, (1) the

relationship between the parties, (2) the balance of harms, and (4) the public-policy considerations.

### Factor (3) Likelihood of Success on the Merits

Under the third *Dahlberg* factor, "if a plaintiff makes even a doubtful showing as to the likelihood of prevailing on the merits, a district court may consider issuing a temporary injunction to preserve the status quo until trial on the merits." *Metro. Sports Facilities Comm'n v. Minn. Twins P'ship*, 638 N.W.2d 214, 226 (Minn. App. 2002), *rev. denied* (Minn. Feb. 4, 2002). Appellants argued during district court proceedings that they were likely to succeed on the merits. The district court agreed with respondent, however, and concluded that appellants' claims are not justiciable and therefore this factor weighs against granting an injunction. The district court reasoned that appellants had "not shown a direct and imminent injury that they would suffer" under section 241.021 and that, therefore, their claims were "not ripe for adjudication." Thus, we first consider justiciability.

Appellants pursued relief under the Minnesota Uniform Declaratory Judgments Act (Act).[6] The supreme court has recognized the "preventative" purpose of declaratory-judgment actions. *County of Blue Earth v. Phillips (In re Improvement of Cnty. Ditch No. 86)*, 625 N.W.2d 813, 821 (Minn. 2001). But "like every other action, a declaratory judgment action must present an actual, justiciable controversy." *McCaughtry*

---

[6] Under the Act, courts have the "power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." Minn. Stat. § 555.01. The Act allows any person "whose rights, status, or other legal relations are affected by a statute" to "have determined any question of . . . validity arising under the . . . statute" and "obtain a declaration of rights, status, or other legal relations thereunder." Minn. Stat. § 555.02.

*v. City of Red Wing*, 808 N.W.2d 331, 337 (Minn. 2011). "To establish a justiciable controversy in a declaratory judgment action challenging the constitutionality of a law, a plaintiff must show a direct and imminent injury which results from the alleged unconstitutional provision." *Id.* (quotations omitted). A plaintiff "need not necessarily possess a cause of action (as that term is ordinarily used) as a basis for obtaining declaratory relief" but must "possess a bona fide legal interest which has been, or with respect to the ripening seeds of a controversy is about to be, affected in a prejudicial manner." *State ex rel. Smith v. Haveland*, 25 N.W.2d 474, 477 (Minn. 1946).

Here, the district court reasoned that the potential harms that appellants would suffer through enforcement of subdivision 4f were "based on a series of hypotheticals" and "too speculative for [the] Court to reach a meaningful resolution by judgment." The district court summarized the "series of hypotheticals":

> First, an individual must be booked into one of the local jails with medication or a prescription with them and must wish to continue taking that medication. The [appellants] must then determine that in their medical judgment dispensing the incarcerated individual's medication is not in the individual's best interest. The incarcerated individual must then disagree with the [appellants'] assessment. The [appellants] must then be unable to reach the incarcerated individual's prescribing provider. After all of those steps, the [appellants] must then choose to ignore the statute and refuse medication to the individual that she believes she needs. The [respondent] must then take regulatory action against the correctional facility.

Appellants contend that the district court erred on the third *Dahlberg* factor when it determined that their claims were not justiciable. First, appellants argue that the district court "failed to give proper weight to the conflict between the legal rights highlighted by

Appellants in this case" and subdivision 4f. Second, appellants emphasize that the Act authorizes relief *before* a party's legal rights have been invaded. Third, and relatedly, appellants argue, quoting *Minneapolis Federation of Men Teachers, Local 238 v. Board of Education*, 56 N.W.2d 203, 205-06 (Minn. 1952), that the district court erred in reasoning that regulatory action by respondent was a prerequisite to a justiciable controversy because "a justiciable controversy exists in declaratory judgment actions like this one . . . even though the 'status quo between the parties has not yet been destroyed or impaired.'"

We are unpersuaded by appellants' arguments based on the supreme court's decision in *McCaughtry*, which analyzed the justiciability of a constitutional challenge brought under the Act. In *McCaughtry*, plaintiffs were landlords and tenants whose properties had been "subject to repeated applications for administrative warrants" under a rental-property inspection ordinance. 808 N.W.2d at 333. The ordinance required the city to "seek permission, from a judicial officer through an administrative warrant," to inspect a property. *Id.* at 334 (quotation omitted). The plaintiffs sought a declaratory judgment that the ordinance violated the Minnesota Constitution because the ordinance did not require a showing of probable cause for the administrative warrant. *Id.* at 334, 339. The ordinance allowed property owners and tenants to challenge administrative warrant applications in district court, and appellants had successfully done so three times. *Id.* at 334-35. During litigation over the third administrative warrant, the district court dismissed appellants' constitutional challenge, reasoning that they had "not suffered an injury that is actual or imminent." *Id.* at 335-36.

On appeal, the supreme court reversed and remanded the district court's decision, concluding that appellants had presented a justiciable controversy. *Id.* at 341. The supreme court decided that the constitutional issue was "neither hypothetical nor abstract" because the city had "actually begun enforcing the rental inspection ordinance against appellants." *Id.* at 340. The supreme court noted that appellants had challenged three administrative warrants and that the city "indicated that it will continue to seek administrative warrants to inspect appellants' properties." *Id.* The supreme court also observed that appellants were "presenting a facial challenge to the constitutionality of the ordinance" that "does not depend on the contents of any administrative warrant application because a facial challenge asserts that a law *always* operates unconstitutionally." *Id.* at 339 (quotation omitted).[7]

*McCaughtry* supports the district court's decision that appellants' claims are not justiciable for two reasons. First, unlike the city in *McCaughtry*, respondent has not "actually begun enforcing" subdivision 4f. Appellants' evidence does not establish any enforcement action or a specific appellant targeted for enforcement. Appellants assert that their affidavits "provide concrete examples based on the real-life experiences of individuals who have provided care to inmates" and "describe the serious problems that *would occur* if the law *were* enforced." (Emphasis added.) This argument implicitly concedes that the

---

[7] The supreme court rejected the city's argument that the availability of proceedings in district court precluded declaratory judgment for three reasons: (1) a "disruption of the status quo is not a prerequisite" to justiciability; (2) a court's action that prevents the ripening of a controversy is "no defense" to a claim; and (3) third, the possibility that a judge might "write in" constitutional limitations to future administrative warrant applications did not render appellants' challenge "premature." *Id.* at 340-41 (quotations omitted).

14

alleged injuries are hypothetical and therefore not ripe for adjudication. *See id.* at 338 ("An injury that is merely possible or hypothetical is not enough to establish justiciability." (quotation omitted)).

We do not suggest, however, that an inmate must be harmed to prove "a direct and imminent injury." *See id.* at 337 (quotation omitted). And it is concerning that respondent's justiciability argument assumes, as explained by respondent's attorney during oral argument to this court, that a medical provider will violate subdivision 4f when statutory compliance runs contrary to their medical judgment. Our concern is not alleviated by respondent's assurance on appeal that subdivision 4f will not be enforced "in a manner that would punish the Appellants for acting to preserve patient health or for following medical ethics and licensure requirements." This argument concedes that the requirements of subdivision 4f and the availability of exceptions may conflict with sound medical judgment for administering medications to some incarcerated persons in some circumstances. Despite these concerns, we are not persuaded that appellants have sufficiently established the likelihood of an enforcement action for an appellant's violation of subdivision 4f when sound medical judgment and state and federal law support *not* administering prescribed medication.

Second, unlike in *McCaughtry*, appellants do not make a facial constitutional challenge to subdivision 4f. 808 N.W.2d at 339; *see, e.g.*, *Thigpen v. Best Home Care LLC*, 29 N.W.3d 205, 213 n.8 (Minn. 2025) ("To succeed on a facial challenge, the challenger must establish that no set of circumstances exists under which the legislation would be valid." (quotation omitted)). Appellants do not claim that subdivision 4f would be

15

unconstitutional in all circumstances. As the district court summarized, a "series of hypotheticals" would have to occur before subdivision 4f would require appellants to administer medication against sound medical judgment and state and federal law. Because appellants' challenge to the statute is not facial, it does not present a "purely legal question" and a factual record would aid the district court in resolving the issues. *McCaughtry*, 808 N.W.2d at 339-40. This supports the district court's conclusion that the controversy is not ripe for adjudication.

Appellants raise a troubling possibility that subdivision 4f may force medical providers to choose between their sound medical judgment and statutory compliance. But this troubling possibility is based on speculation. Thus, the district court did not abuse its discretion by concluding that the alleged harms were too speculative to be justiciable and therefore that appellants were unlikely to succeed on the merits. Because the district court did not abuse its discretion by weighing the third *Dahlberg* factor against granting the injunction based on justiciability, we need not reach the parties' other arguments on the likelihood that appellants' claims would succeed.

### Factor (1) Relationship Between the Parties

The first *Dahlberg* factor favors an injunction that will maintain the status quo between the parties. *Metro. Sports Facilities Comm'n*, 638 N.W.2d at 221. Thus, the first factor requires an examination of the parties' relationship. The district court characterized the parties' relationship as "regulated facilities and the Commissioner who regulates them" and determined that a temporary injunction "would not alter the parties' relationships." The

district court ultimately concluded that this factor "is neutral on the question of whether an injunction should issue."

Appellants contend that the district court misapplied the law and that this factor favors an injunction barring enforcement of subdivision 4f because doing so "would not alter the relationship between the parties." Appellants argue that "[d]enying injunctive relief would alter the [parties'] relationship" because subdivision 4f establishes a basis for enforcement actions and thus the injunction is necessary to maintain the status quo.

We are not persuaded that the district court abused its discretion in determining that this factor is neutral. Many new statutes alter the status quo between the government and a regulated party. If mere alteration of a relationship could tip this factor, the first *Dahlberg* factor would favor injunctive relief in many challenges to new statutes. Such a result would contradict the longstanding principle that courts "owe great deference to the judgment of the legislature as to matters properly within its purview." *Fugina v. Donovan*, 104 N.W.2d 911, 915 (Minn. 1960); *see Baertsch v. Minn. Dep't of Revenue*, 518 N.W.2d 21, 24 (Minn. 1994) (describing "a specific effective date for [a] statute" as "a clear manifestation" of legislative intent). Instead, we conclude that subdivision 4f is another provision within a preexisting enforcement scheme and that it therefore does not "create a new legal relationship between the parties" supporting a preliminary injunction. *Metro. Sports Facilities Comm'n*, 638 N.W.2d at 221. Because deference to legislative judgment supports the district court's conclusion that the first *Dahlberg* factor is neutral, it was not an abuse of discretion.

### *Factor (2) The Balance of Harms*

Under the second *Dahlberg* factor, the movant "must show irreparable harm to trigger an injunction" while the nonmoving party "need only show substantial harm to bar it." *Pac. Equip. & Irrigation, Inc. v. Toro Co.*, 519 N.W.2d 911, 915 (Minn. App. 1994), *rev. denied* (Minn. Sept. 16, 1994). "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (quotation omitted); *see also Metro. Sports Facilities Comm'n*, 638 N.W.2d at 223-25 (concluding that "the district court did not abuse its discretion in considering harm to the public when deciding whether to grant temporary injunctive relief").

The district court concluded that respondent "met its burden of demonstrating sufficient substantial harm to the public to preclude the issuance of an injunction." The district court noted three distinct harms that would arise from enjoining enforcement of subdivision 4f: (1) the injunction would "significantly undermine" legislative intent; (2) the injunction would impair the commissioner's "ability to safeguard the health, safety, and orderly operation of correctional facilities"; and (3) the injunction would "jeopardiz[e] the continuity of medical care for incarcerated individuals." The district court also noted the "unripe and speculative nature of [appellants'] complaints" under this factor.

Appellants challenge the district court's conclusion for two reasons. First, appellants argue that the district court erred in relying on legislative testimony that supported a version of the bill that "did not contain the problematic requirements" of consulting with the prescribing licensed health care professional or obtaining consent from the inmate to satisfy

an exception to the mandate in subdivision 4f before changing a prescription. This argument is unavailing because appellate courts "do not consider legislative history if the statute's language is clear on its face." *Great N. Ins. Co. v. Honeywell Int'l, Inc.*, 911 N.W.2d 510, 518 (Minn. 2018). Appellants do not argue that subdivision 4f is not "clear on its face." Thus, even assuming that appellants' legislative-history argument is accurate, we rely on the unambiguous language of subdivision 4f to determine legislative intent. And subdivision 4f unambiguously requires consultation with the prescribing licensed health care professional or inmate consent before changing prescription medication. Thus, the district court therefore did not abuse its discretion by concluding that a temporary injunction would undermine legislative intent.

Second, appellants argue that "an injunction would not hinder Respondent's goal of protecting inmates' health and welfare, but rather, would actually support that goal" because existing statutes and rules are sufficient. Appellants cite administrative rules on staff training and procedures related to medical care in correctional facilities. But none of these rules expressly protect an inmate's access to prescription medication except Minnesota Rule 2911.6600, subpart 11 (2025), which states that an "inmate shall not be deprived of medication as a means of punishment." The overlap between subdivision 4f and existing rules is minimal. The district court therefore did not abuse its discretion by concluding that a temporary injunction would harm respondent's ability to safeguard inmate health by enforcing subdivision 4f.

In their brief, appellants do not appear to contest that the temporary injunction would jeopardize the continuity of care for incarcerated persons with prescriptions. Still,

we recognize that appellants' affidavits describe plausible circumstances when enforcement of subdivision 4f could lead to harm. But because the circumstances described are hypothetical and the supreme court stated that a temporary injunction "should be granted only when it is clear that the rights of a party will be irreparably injured before a trial on the merits is held," *Miller*, 317 N.W.2d at 712, these affidavits do not tip the second *Dahlberg* factor in favor of injunctive relief.

We conclude that each of the harms identified by the district court is supported by the law and the record, as is its determination that appellants established only speculative harm. Thus, the district court did not abuse its discretion by concluding that the second *Dahlberg* factor weighed against issuing a temporary injunction.

### Factor (4) Public-Policy Considerations

The district court concluded that it was a "close call," but the fourth *Dahlberg* factor weighed against granting a temporary injunction. The district court acknowledged there is a "compelling public policy concern" that subdivision 4f might undermine medical-care providers in correctional facilities, "create a chilling effect on the availability of necessary care and threaten the stability of correctional health systems." But the district court concluded that this concern was outweighed by the subdivision 4f's policy of guaranteeing a detainee's "right to meaningfully access their prescribed medication." The district court reasoned that the legislature is "far better equipped to discern meaningful public interest than a single judge making a ruling based upon limited facts."

Appellants contend that the district court abused its discretion because the public policy of promoting inmate health care is better served by allowing medical providers to

20

exercise sound medical judgment without the constraints enacted in subdivision 4f. Appellants argue that obtaining inmate or prescriber consent to change prescribed medications is unworkable and will undermine the public policy that subdivision 4f purports to advance.

We are not convinced that the district court abused its discretion. It is not the courts' role to second-guess the legislature's policy decisions. *In re Welfare of M.L.M.*, 813 N.W.2d 26, 35 (Minn. 2012). Subdivision 4f expresses the legislature's intent to guarantee that inmates receive prescribed medications and to limit appellants' discretion to change an inmate's prescription medications without consulting the prescribing physician or obtaining the inmate's consent. *See Smith v. Carver County*, 931 N.W.2d 390, 395 (Minn. 2019) ("The plain language of the statute is our best guide to the Legislature's intent."). We acknowledge that appellants raise some compelling challenges to the policy expressed in subdivision 4f, but any disagreement with the policy underlying a statute "should be directed to the legislature." *Irongate Enters., Inc. v. County of St. Louis*, 736 N.W.2d 326, 331 (Minn. 2007). The district court did not abuse its discretion by deferring to the legislature's policy determinations as expressed in subdivision 4f and concluding that the fourth *Dahlberg* factor weighed against a temporary injunction.

Because the district court did not abuse its discretion by concluding that three *Dahlberg* factors weighed against granting a temporary injunction, one factor was neutral, and one factor favored granting the injunction, we conclude that it was not an abuse of discretion for it to deny appellants' motion for a temporary injunction. Therefore, we affirm

21

the district court's decision to deny appellants' motion for a temporary injunction. We take no position on the merits of appellants' underlying complaint.

**Affirmed.**